# EXHIBIT A

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **DEBBIE GODWIN** | )    **CASE NO.:** |
| **EXECUTRIX OF THE ESTATE OF** | ) |
| **ROBERT GODWIN SR, DECEASED** | ) |
| **2250 PAR LANE, PH10** | )    **JUDGE:** |
| **WILLOUGHBY HILLS, OHIO 44094** | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
|    vs. | )    <u>**COMPLAINT**</u> |
| | ) |
| **FACEBOOK, INC** | )    *(Jury Demand Endorsed Hereon)* |
| **C/O ITS REGISTERED AGENT** | ) |
| **CORPORATION SERVICE COMPANY** | ) |
| **2711 CENTERVILLE RD** | ) |
| **SUITE 400** | ) |
| **WILMINGTON, DE 19808** | ) |
| | ) |
| **FACEBOOK PAYMENTS, INC** | ) |
| **C/O ITS REGISTERED AGENT** | ) |
| **COPORATION SERVICE COMPANY** | ) |
| **2711 CENTERVILLE RD** | ) |
| **SUITE 400** | ) |
| **WILMINGTON, DE 19808** | ) |
| | ) |
| **FACEBOOK SERVICES, INC** | ) |
| **C/O ITS REGISTERED AGENT** | ) |
| **COPORATION SERVICE COMPANY** | ) |
| **2711 CENTERVILLE RD** | ) |
| **SUITE 400** | ) |
| **WILMINGTON, DE 19808** | ) |
| | ) |
| **ATLAS SOLUTIONS, LLC** | ) |
| **C/O ITS REGISTERED AGENT** | ) |
| **COPORATION SERVICE COMPANY** | ) |
| **2711 CENTERVILLE RD** | ) |
| **SUITE 400** | ) |
| **WILMINGTON, DE 19808** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

CROWDTANGLE, INC )
C/O ITS REGISTERED AGENT )
COPORATION SERVICE COMPANY )
2711 CENTERVILLE RD )
SUITE 400 )
WILMINGTON, DE 19808 )
)
BRENDA D. JOINER-HAYMON )
EXECUTRIX OF THE ESTATE OF )
STEVE W. STEPHENS, DECEASED )
4823 ANDERSON RD. )
LYNDHURST, OHIO 44124 )
)

And

XYZ COMPANIES AND JOHN DOES, 1-10

Defendants.

Now comes Plaintiff, as Executrix of the Estate of Robert Godwin Sr, and for her Complaint against the Defendants, states as follows:

## INTRODUCTION

1. Facebook began in 2004 as an online social networking service. At the time of its origin, Facebook's mission was focused on providing a platform for people to stay connected, discover what was going on in the world and share/express what mattered to them.

2. This lawsuit does not challenge, in any respect, Facebook's role in providing a platform for its users to engage in such conduct, or its role as an interactive computer services provider. Likewise, this lawsuit does not seek to hold Facebook responsible for any content or information posted on its platform by its users. Finally, this lawsuit does not challenge free speech, the First Amendment rights and privileges or any effort "to make the world more open and connected." Rather, this lawsuit focuses on Facebook's own conduct in operating a separate and distinct business – a business that focuses on the collection, analysis, use, exploitation and/or

sale of information.  It is this business that creates a special relationship between Facebook and its users and, in turn, a duty of care.

3.      In order to use Facebook's interactive computer services- its platform for "free speech"- users are required to relinquish control over a wide array of information about themselves.  Facebook then uses this information, not to help the world stay connected or further free speech, but rather to generate billions of dollars.

4.      Facebook, through its sophisticated algorithms, searches, resources and data mining and its network of entities, Facebook, Inc., Facebook Payments, Inc., Facebook Services, Inc., Atlas Solutions, LLC, and CrowdTangle, Inc. (collectively Facebook Defendants), obtains and then sells information about its users.  Facebook prides itself on having the ability to collect and analyze, in real time, and thereafter sell a vast array of information so that others can specifically identify and target users for a variety of business purposes, including, but not limited to, very pointed and specific advertising activities.

5.      Facebook focuses its commercial venture on Developers and Advertisers. Developers and Advertisers use Facebook for commercial purposes.  Developers sell their applications ("apps") and products and Advertisers advertise, using the specific data/information generated by the activities of Facebook's users.  Facebook does not sell itself to the investing public as an entity designed to simply provide a platform for communication of ideas, thoughts and free speech.  Rather, Facebook markets itself as a very sophisticated business that collects and sells data relating to virtually every aspect of its users' lives and lifestyles.

6.      Facebook has been successful in its business venture, with a market cap in excess of Four Hundred and Fifty Billion Dollars ($450,000,000,000.00).   In 2016 alone, Facebook

generated Twenty-Seven Billion Dollars ($27,000,000,000.00) in revenue, 97% of which was revenue generated from its separate advertising business.

7.      This lawsuit alleges claims based upon the duty created as a result of the Facebook Defendants' special business relationship with its users and the acquisition of intimate knowledge/information relating to their activities, intentions, wishes, desires and even their specific location. The Facebook Defendants' made a very calculated business decision to take control of information provided by its users, and then mine, organize and sell the information as a business that is separate and distinct from the provision of any interactive computer services. This lawsuit seeks to hold the Facebook Defendants responsible for breaching their duty of care arising out of that special and distinct relationship and as a result, causing damage to the Plaintiff.

8.      The claims alleged herein in no way implicate the Facebook Defendants as publishers or speakers of third party content. Further, the claims alleged herein do not seek to regulate what can or cannot be said or posted on/through the Facebook Defendants' interactive computer services.  As well, the claims asserted herein do not require the Facebook Defendants to monitor, edit, withdraw or block any content supplied by its users.  Plaintiff does not challenge the Facebook Defendants' right to publish or permit any information they receive from their users on their interactive computer services.  Rather, this lawsuit seeks to hold the Facebook Defendants responsible for their own conduct, outside, and independent of, their role as an internet service provider, including their failure to take any action in response to a known and credible threat of violence.

9.      Finally, this lawsuit seeks to hold the Estate of Steve Stephens liable for the heinous, violent acts of Steve Stephens that could have been prevented had the Facebook Defendants discharged their duties.

## PARTIES

10.     Plaintiff is the duly appointed Executrix of The Estate of Robert Godwin Sr. who passed away on April 16, 2017. Plaintiff resides in Cuyahoga County, Ohio and The Estate of Robert Godwin Sr. is being administered in Cuyahoga County, Ohio. Plaintiff brings this action on behalf of the Estate of Robert Godwin Sr and his surviving next of kin as follows: Debbie D. Godwin, Tonya R. Baines, Malisa Godwin, Tammy L. Godwin, Brenda D. Joiner-Haymon, Robert Godwin Jr, Robbie Miller, Naujia Ann Godwin, Terell Godwin and Marsaen Godwin.

11.     Defendant, Facebook, Inc., ("Facebook') is a publicly traded company, incorporated in the State of Delaware which conducts business throughout the world, with its principal place of business located in the State of California.

12.     Defendant, Facebook Payments, Inc., ("Facebook Payments") is an entity incorporated in the State of Delaware which conducts business throughout the world, with its principal place of business located in the State of California. Facebook Payments is affiliated, and conducts business in concert, with Facebook by providing services to receive and disburse payment from third parties in exchange for the services/conduct at issue in this lawsuit.

13.     Defendant, Facebook Services, Inc. ("Facebook Services") is an entity incorporated in the State of Delaware which conducts business throughout the world, with its principal place of business located in the State of California. Facebook Services is affiliated, and conducts business in concert, with Facebook by providing support for the services/conduct at issue in this lawsuit.

14.     Defendant, Atlas Solutions, LLC ("Atlas') is an entity established in the State of Delaware which conducts business throughout the world, with its principal place of business located in the State of California.  Atlas is affiliated, and conducts business in concert, with

Facebook by providing ad-serving and measurement support for the services/conduct at issue in this lawsuit.

15.     Defendant, CrowdTangle, Inc. ("CrowdTangle") is an entity incorporated in the State of Delaware which conducts business throughout the world, with its principal place of business located in the State of California. CrowdTangle is affiliated, and conducts business in concert, with Facebook by providing a social analytic platform to support the services/conduct at issue in this lawsuit.

16.     Defendant, Brenda D. Joiner-Haymon, is the duly appointed Executrix of The Estate of Steve Stephens, who passed away on April 18, 2017.  Ms. Joiner is a resident of Cuyahoga County, Ohio and The Estate of Steve Stephens is being administered in Summit County Probate Court. Ms. Joiner was appointed Executrix, not due to any affiliation with Mr. Stephens, but rather for the sole purpose of proceeding with the claims herein as no other person desired to serve as a representative of Mr. Stephens' Estate.

17.     Upon information and belief, XYZ Companies, 1-10 and John Does 1-10 are corporations, limited liability companies, partnerships or other entities as well as owners, officers, partners, principals, employees and/or supervisors who have directly and/or indirectly participated in and/or ratified, the unlawful conduct as set forth herein.

## JURISDICTION & VENUE

18.     This Court has jurisdiction over this case insofar as Plaintiff's claims arise under Ohio statutory and/or common law.

19.     This Court has jurisdiction over each of the Defendants to the extent that each Defendant is a citizen of the State of Ohio and/or, among other things, transacted business in the State of Ohio and engaged in improper conduct in the State of Ohio.

20.     Venue is appropriate in this Court pursuant to, among other, Civil Rule 3(B)(6) because all or part of Plaintiff's claim for relief arose in Cuyahoga County, Ohio.

## STATEMENT OF FACTS

21.     The Facebook Defendants have a special and unique relationship with each and every Facebook user. The Facebook Defendants require each user to relinquish control over information concerning their feelings, beliefs, intentions, wants, desires, likes, dislikes, location, goals, tendencies, etc., so that the Facebook Defendants can collect, analyze, package, exploit and sell the information as a business venture.

22.     For any content that is covered by intellectual property rights, users specifically give the Facebook Defendants a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use the content.

23.     Likewise, users specifically give the Facebook Defendants permission to use their name, profile picture, content and information in connection with commercial, sponsored, or related content served or enhanced by the Facebook Defendants.

24.      The Facebook Defendants collect and analyze the content and other information their users provide while using Facebook services.

25.     The Facebook Defendants also collect and analyze information about how their users view content and the frequency and duration of their activities. This includes collecting and mining information shared among users such as messages or photos.

26.     The Facebook Defendants also collect and analyze information about the people and groups their users are connected to and how they interact with them.

7

27.      The Facebook Defendants also collect and analyze information about their users' emotional states, such as whether and when they feel worthless, insecure, defeated, anxious, useless, stupid, overwhelmed, stressed or like a failure.

28.      The Facebook Defendants also collect and analyze contact information users provide if they upload, sync or import information (such as an address book) from another device.

29.      The Facebook Defendants also collect and analyze information about users' purchases and financial transactions, including information about credit/debit cards, account and authentication information and billing, shipping and contact details.

30.      The Facebook Defendants also collect and analyze information from or about the computers, phones, or other devices where users install or access Facebook services including, but not limited to, information about the attributes of the operating system, hardware version, device settings, file and software names and types, battery and signal strength and device identifiers.

31.      The Facebook Defendants also collect and analyze information about device locations, including specific geographic locations, such as through GPS, Cellular, Bluetooth, or WIFI signals, as well as connection information such as the name of the mobile operator or ISP, browser type, language and time zone, mobile phone number and IP address.

32.      The Facebook Defendants also collect and analyze information when users visit third-party websites and apps that use Facebook's services including information about websites and apps users visit, their use of Facebook services on those websites and apps and information the developer/publisher of the app/website provides to the user or Facebook.

33.      The Facebook Defendants collect and analyze information about their users' activities away from Facebook, including offline activities in traditional brick and mortar stores.

For example, if a user visits a website with a "Like" button, information about the user's activity is sent to the Facebook Defendants, whether or not the user is actually logged into their Facebook account. Likewise, a visit to a local shoe store can prompt ads in the Facebook news feed for shoes.

34. The Facebook Defendants do not collect and analyze information as set forth above in an effort to monitor, remove, or do anything at all to the content posted by the user. Rather, the Facebook Defendants quite intentionally engage in such activities for the sole purpose of operating a business, separate and distinct from the provision of interactive computer services, that produces billions of dollars.

35. The Facebook Defendants concede that they do not simply provide a platform for free speech or a neutral public forum. Likewise, the Facebook Defendants concede that there are occasions when they, themselves generate content on Facebook.

36. Consistent with the special relationship they enjoy with their users, the Facebook Defendants have access to, and use of, a wealth of information that allows them to understand, assess and analyze the specific behaviors, intentions, likes, dislikes, tendencies, locations and activities of their users. The Facebook Defendants also have the unique ability to control every aspect of the relationship while the user engages in services offered by Facebook and third-party partners.

37. The Facebook Defendants organize and prioritize the content they collect from the users. The Facebook Defendants are able to accomplish their organization, prioritization and distribution tasks in real time, often delivering information in less than one second.

38. The Facebook Defendants utilize this vast array of information to drive commercial activity and predict the behaviors of their users. For instance, the Facebook

Electronically Filed 01/19/2018 13:55 / / CV 18 891841 / Confirmation Nbr. 1279297 / CLJML

Defendants utilize the information to "personalize content" and "make suggestions" for their users.

39.     The Facebook Defendants also use the information collected, including information about the location of users to suggest local events or offers.

40.     The Facebook Defendants use the information collected to predict, and sometimes manipulate, the behaviors and moods of their users.

41.     The Facebook Defendants use the information collected to predict likes and dislikes, suggest new Facebook "friends" and content.

42.     The Facebook Defendants pride themselves on the accuracy of their information and predictions.

43.     The Facebook Defendants utilize the information they collect from their users as an asset to further their commercial enterprise.

44.     The Facebook Defendants generate massive amounts of money by selling the information they collect from their users to others who wish to communicate with, and/or market/advertise/sell goods and services to Facebook users.  The Facebook Defendants have a platform designed to "find the right people, capture their attention and get results." The Facebook Defendants have sophisticated advertising measurement systems and analytics that are used to drive ad pricing based upon the content provided by the users.

45.     The Facebook Defendants sell the information that they collect from their users to allow advertisers to specifically choose their audience.

46.     The Facebook Defendants have "powerful audience selection tools" that allow advertisers to specifically target people who "are right for" their business.  An audience can be selected: (a) manually based on characteristics like age and location; (b) in a customized manner

based upon contact lists; or (c) from a "Lookalike Audience" that allows selection of people "similar" to them on Facebook.

47.     The Facebook Defendants also offer, again as a result of the information they collect from users, "Core Audiences targeting options" that allow communication with people based on their: (a) demographics-traits like age, gender, relationship status, education, workplace, job titles and more; (b) location; (c) interests like hobbies, entertainment and more; and (d) behaviors.

48.     The information collected and sold by the Facebook Defendants from their users allows them to specifically target and find people.

49.     The Facebook Defendants are also involved in creating the ad content for the advertisers.    For instance, Facebook reviews, advises, approves and disapproves of advertisements. Options are suggested to allow advertisers to better "choose" their audience.

50.     As an entity engaged in a separate commercial venture, the Facebook Defendants have such control over the flow of information collected, and the attendant services provided as a result, that they have prescribed rules and regulations that actually limit and constrict the free flow of ideas and speech-the heart of their "mission" as a provider of interactive computer services.

51.     For instance, Developers and Advertisers are precluded from promoting content, services or activities that are deemed to be "contrary to" the Facebook Defendants' competitive position, interests or advertising philosophy.

52.     As well, Developers and Advertisers are precluded from incentivizing users to engage in actions that are beyond the scope of their specific commercial purpose.

53.     The Facebook Defendants also publish a laundry list of content that is "prohibited" when used by Advertisers and Developers including controversial political and social issues.

54.     Defendant, Atlas Solutions, a Facebook company, is a "world-class ad-serving and measurement platform" that offers services to advertisers and agencies to help them deliver and understand the effectiveness of their ad campaigns.  Atlas Solutions analyzes and assesses the information it collects and then sells to advertisers with the goal of further helping them to reach the "right audiences at the right time."

55.     Atlas Solutions measures ad campaign performance and provides "deep, accurate and actionable insights."

56.     In so doing, Atlas Solutions collects information from the browser or device visits such as device type, operating system, unique identifiers, IP address, location, browser type and language and date/time of visit.   Atlas Solutions also collects information about users' purchases and interests.

57.     Atlas Solutions uses the information it collects to help "find and match appropriate audiences to advertiser campaigns and to customize the ads served to the users' browser or device. To accomplish this task, Atlas Solutions uses information that it has about users' activities over time and across different websites, apps, browsers and devices. Atlas Solutions gathers enough detailed information about Facebook users to determine when to show a specific ad based on the website or app the user is on and then determine what the user "may be interested in."

Electronically Filed 01/19/2018 13:55 / / CV 18 891841 / Confirmation Nbr. 1279297 / CLJML

58.     Defendant CrowdTangle, another Facebook company, collects information about Facebook users for the specific purpose of helping publishers and media companies "surface stories that matter, measure their social performance and identify influencers."

59.     Once again, in order to accomplish its mission, CrowdTangle collects information from: (a) users or others while utilizing Facebook/Facebook services; (b) devices used; and (c) third party partners and integrations.

60.     Defendant Facebook Payments, another Facebook company, collects users' non-public personal financial information for the purpose of assisting users to make payments on Facebook. This information is shared with Facebook to process payments and for maintenance of payment accounts.

61.     Through their data mining, collection, assessment, control and analysis of information about their users as described herein, the Facebook Defendants have specific and special knowledge of users' behaviors, intentions, tendencies, likes, dislikes, etc. As such, the Facebook Defendants recognize and acknowledge that they have a duty, arising from their separate commercial venture and their special relationship with their users, to promote safety and security and to report violent threats and behavior.

62.     In that regard, Mark Zuckerberg, the Facebook Defendants' Founder, Chairman and Chief Executive Officer has acknowledged the existence of a duty on their part, which results from unfettered access to, and the collection/analysis of, users' personal information to prevent harm and keep people safe. Specifically, Mr. Zuckerberg confirmed the fact that the Facebook Defendants are in a "unique position to help prevent harm." Mr. Zuckerberg explained that "this is because of the amount of communication across our network" and "our ability to quickly reach people worldwide in an emergency."

Electronically Filed 01/19/2018 13:55 / / CV 18 891841 / Confirmation Nbr. 1279297 / CLJML

63.     Similarly, Sheryl Sandberg, the Facebook Defendants' COO, has acknowledged a shift in their mission over time.   The initial goal of simply connecting people has changed; as the Facebook Defendants access, collect, analyze and then use, for profit, users' personal information, they also "want to do good" and "help build a community." She went on to acknowledge that, as a "new kind of platform," they have responsibility- and given their size even "more responsibility" – due to the information that is accessible to them.

64.      The Facebook Defendants also acknowledge their duty to notify and to work with law enforcement when there is a genuine risk of physical harm or threats to public safety.

65.     Given their aggressive and far reaching efforts to predict user action and to mine, collect, assess, control and analyze information, the Facebook Defendants' possess unique knowledge of, and insight into, the actions and intentions of their users, not just for purposes of commercial activities, but also as to threats of violence, safety, security and criminal activity.

66.      The Facebook Defendants have such a clear understanding of the behaviors and intentions of their users that, when they implemented live video services they understood "yes, of course Facebook users would commit murder" while using such services.

67.     Steve Stephens was a registered Facebook user, engaging in conduct pursuant to Facebook's Statement of Rights and Responsibilities, Data Policy and other policies, procedures and terms/conditions.

68.     On April 16, 2017, the Facebook Defendants, through their own conduct of mining, collecting, assessing, controlling and/or analyzing information from their users in furtherance of their commercial enterprise as described herein, had actual and/or constructive knowledge/notice that one of their users, Steve Stephens, had engaged in criminal conduct by making intimidating and coercive threats of violence:

14

> FB my life for the pass year has really been fuck up!!! [sic] I lost everything I ever had due to gambling at the Cleveland Jack casino and Erie Casino...I not going to go into details [sic] but I'm a my breaking point I'm really on some murder shit...FB you have 4 minutes to tell me why I shouldn't be on death row!!!! I'm dead serious #teamdeathrow

69. The Facebook Defendants took no action in response to the information they collected despite having prior knowledge/notice of Mr. Stephens' ownership and use of firearms which were suggestive of his violent tendencies.

70. A few minutes later, the Facebook Defendants, again through their own conduct as described herein, had actual and/or constructive knowledge/notice that Steve Stephens was not willing to wait any longer for a response from Facebook before he began his criminal activity.

71. The Facebook Defendants took no action in response to the information they collected.

72. As time passed, the Facebook Defendants, again through their own conduct as described herein, had actual and/or constructive knowledge/notice that Steve Stephens' criminal activity was imminent when he engaged in further criminal conduct by reiterating his intent to commit random acts of murder on the public and he specifically identified himself and his location.

73. The Facebook Defendants took no action in response to the information they collected.

74. Thereafter, the Facebook Defendants, again through their own conduct as described herein, had actual and/or constructive knowledge/notice that Steve Stephens had murdered Robert Godwin Sr, on the public streets, just minutes from the location where he previously advised the Facebook Defendants of his criminal intentions.

75.     Still, the Facebook Defendants took no action in response to the information they collected.  However, the Facebook Defendants possessed this knowledge, and the ability to alert law enforcement, with more than sufficient time to act and prevent Robert Godwin, Sr.'s death.

76.     Mr. Stephens described his actions as an "Easter day slaughter... ."

77.     Mr. Godwin was forced to speak with Mr. Stephens, prior to his death, with a gun pointed at his face.  Sadly, Mr. Godwin spent the last minutes of his life in fear, and anticipation, of his death.

78.     Robert Godwin Sr. was 74 years old when he was murdered.  Mr. Godwin left behind daughters, Debbie D. Godwin, Tonya R. Baines, Malisa Godwin, Tammy L. Godwin, Brenda Joiner, and Naujia Ann Godwin and sons, Robert Godwin Jr, Robby Miller, Terell Godwin and Marsean Godwin.  As well, Mr. Godwin was a proud grandfather.  His senseless murder was a tremendous loss and has created irreparable damage and sadness to his family.

79.     For over a year before Mr. Godwin's murder, the Facebook Defendants had actual and/or constructive knowledge/notice of a multitude of criminal conduct involving users with whom they had a special relationship as a result of the collection and ownership of information. Many of the incidents involved criminal acts of violence on human beings ranging from torture of a disabled child to suicide to the murder of children and adults.

80.     Following Mr. Godwin's murder, Facebook founder, Chief Executive Officer, Chairman of the Board and Majority Stockholder, Mark Zuckerberg stated:

> We have a lot more to do here. We're reminded of this this week by the tragedy in Cleveland. Our hearts go out to the family and friends of Robert Godwin Sr.  We have a lot of work and we will keep doing all we can to prevent tragedies like this from happening.

Electronically Filed 01/19/2018 13:55 / / CV 18 891841 / Confirmation Nbr. 1279297 / CLJML

## COUNT ONE
### *Negligence / Failure to Warn*
### *Against All Facebook Defendants*

81.     Plaintiff incorporates the foregoing by reference as if fully set forth herein.

82.     At all times relevant, the Facebook Defendants had a special relationship with Steve Stephens.  This special relationship arose out of the Facebook Defendants' collection of, and control over, the data and information provided by, and received from, Mr. Stephens.  This special relationship also resulted from the ability on the part of the Facebook Defendants to, in real time, cull, mine, analyze, and synthesize information collected from Mr. Stephens.  As a result of this special relationship, the Facebook Defendants have the ability to observe, analyze, predict, anticipate, and even manipulate the behavior of individuals, including Mr. Stephens.  Indeed, as a result of the special relationship between the Facebook Defendants and Mr. Stephens, the Facebook Defendants possessed a complete and holistic picture of Mr. Stephens' thoughts, emotions, desires, location and intentions.

83.     On April 16, 2017, as a result of their special relationship, and their collection, analysis, and use of data/information, the Facebook Defendants: (a) became aware of Mr. Stephens' intent to commit murder and/or engage in imminent acts of violence and (b) had reason to appreciate that Mr. Stephens had the means and propensity to carry out his threat.  As a result, the Facebook Defendants were aware of the imminent threat Mr. Stephens therefore posed to individuals in the surrounding geographic vicinity.

84.     As a result of their special relationship with Mr. Stephens, and their collection, analysis, and use of data/information, the Facebook Defendants had a duty to warn potential victims of Mr. Stephens' intended actions.   Given that the Facebook Defendants possessed

17

information concerning Mr. Stephens' geographic location, this duty could easily have been met by alerting authorities in the immediate vicinity of Mr. Stephens about his announced intentions.

85. Notably, the duty owed by the Facebook Defendants is not premised upon the content posted by their users or based upon the Facebook Defendants providing a platform for users to post information. Rather, the duty owed by the Facebook Defendants arises entirely from the special relationship they have with their users, including Mr. Stephens, based upon their collection, mining, analysis and use of information concerning their users.

86. In contravention of the duty arising out of their special relationship with Mr. Stephens and disregarding the credible evidence collected from Mr. Stephens regarding his plan to commit murder, the Facebook Defendants failed to take any steps to warn or protect those threatened by Mr. Stephens' by alerting local law enforcement authorities.

87. As a direct and proximate cause of the Facebook Defendants' failure to warn, Mr. Godwin was killed within a reasonable vicinity of Mr. Stephens' location at the time when the Facebook Defendants learned of his intention to commit murder.

88. As a direct and proximate cause of the Facebook Defendants' negligence, Mr. Godwin suffered economic and non-economic compensatory damages and, through his estate, is entitled to recover compensatory damages in an amount to be proven at trial.

89. The Facebook Defendants' conduct was intentional, willful, malicious, in bad faith and in reckless disregard for the rights of Mr. Godwin thereby entitling Mr. Godwin, through his estate, to punitive damages.

18

## COUNT TWO
### *Civil Recovery for a Criminal Act*
### *Against All Facebook Defendants*

90.     Plaintiff incorporates the foregoing by reference as if fully set forth herein.

91.     The Facebook Defendants were aware of statements made by Mr. Stephens which constituted threats that were made with the intent to intimidate or coerce a civilian population.

92.     Mr. Stephens' threats caused a reasonable expectation of the imminent commission of making terroristic threats.

93.     Mr. Stephens' statement that he intended to do some "murder shit," of which the Facebook Defendants were aware, constituted terroristic threats in violation of Ohio R.C. § 2909.23.

94.     Pursuant to Ohio R.C. § 2909.23, making terroristic threats is a felony of the third degree.

95.     The Facebook Defendants were aware that Mr. Stephens was engaged in the commission of a felony.

96.     Under Ohio R.C. § 2921.22, the Facebook Defendants, aware of Mr. Stephens' commission of a felony, were under a duty to report that information to law enforcement authorities.

97.     The Facebook Defendants knowingly failed to report Mr. Stephens' commission of a felony to law enforcement authorities.

98.     The Facebook Defendants' knowing failure to report Mr. Stephens' conduct was a violation of Ohio R.C. § 2921.22.

19

99.     As a direct and proximate result of the Facebook Defendants' criminal conduct in violating Ohio R.C. § 2921.22, Robert Godwin suffered economic and non-economic damages and, through his estate, is entitled to recover compensatory damages in an amount to be proven at trial pursuant to Ohio R.C. § 2307.60.

100.    The Facebook Defendants' conduct was intentional, willful, malicious, in bad faith and in reckless disregard for the rights of Mr. Godwin thereby entitling Mr. Godwin, through his estate, to punitive and exemplary damages pursuant to Ohio R.C. § 2307.60.

### COUNT THREE
*Negligence / Failure to Warn*
*Against All Facebook Defendants*

101.    Plaintiff incorporates the foregoing by reference as if fully set forth herein.

102.    Pursuant to Ohio R.C. § 2921.22, the Facebook Defendants had a duty to warn the general public about Mr. Stephens' commission of a felony.

103.    In contravention of this duty, the Facebook Defendants failed to take any steps to warn or protect those threatened by Mr. Stephens' stated intention to do some "murder shit" by alerting law enforcement authorities.

104.    As a direct and proximate cause of the Facebook Defendants' failure to warn, Mr. Godwin was killed within a reasonable vicinity of Mr. Stephens' location at the time the Facebook Defendants learned of his intention to commit murder.

105.    As a direct and proximate cause of the Facebook Defendants' negligence, Mr. Godwin suffered economic and non-economic compensatory damages and, through his estate, is entitled to recover compensatory damages in an amount to be proven at trial.

20

106.     The Facebook Defendants' conduct was intentional, willful, malicious, in bad faith and in reckless disregard for the rights of Mr. Godwin thereby entitling Mr. Godwin, through his estate, to punitive damages.

### COUNT FOUR
*Wrongful Death*
*Against all Defendants*

107.     Plaintiff incorporates the foregoing by reference as if fully set forth herein.

108.     Plaintiff brings this claim for wrongful death for and on behalf of the next of kin and beneficiaries of the decedent, Robert Godwin Sr.

109.     As a direct and proximate result of the above described negligent acts and/or omissions on the part of the Defendants, the decedent, Robert Godwin Sr, came wrongfully to his death, whereby the next of kin of the decedent were caused to incur substantial pecuniary loss, including loss of support, expenses, and great anxiety, grief and bereavement.

110.     By reason of the foregoing, the decedent, Robert Godwin Sr.'s next of kin have been caused the loss of companionship, assistance, attention, protection, advice, guidance, counseling, instruction and training of Mr. Godwin and therefore demand damages against the Defendants as set forth below so as to fully and fairly compensate decedent's next of kin for all their losses.

### COUNT FIVE
*Survivorship*
*Against all Defendants*

111.     Plaintiff incorporates the foregoing by reference as if fully set forth herein.

112.     On April 16, 2015, in the moments immediately preceding his death, Robert Godwin, Sr. realized and appreciated the act of violence that was about to be committed against him.

113.    Thereafter, as a direct and proximate result of the conduct of Defendants, Mr. Godwin suffered physical and emotional pain and suffering on in the moments from when he encountered first encountered Mr. Stephens and realized the harm that was about to befall him until he ultimately died.

114.    As a direct and proximate result of Defendants' wrongful acts and/or negligence, Mr. Godwin suffered non-economic compensatory damages and, through his estate, is entitled to recover compensatory damages in an amount to be proven at trial.

115.    The Defendants' conduct was intentional, willful, malicious, in bad faith and in reckless disregard for the rights of Mr. Godwin thereby entitling Mr. Godwin, through his estate, to punitive damages.

WHEREFORE, Plaintiff, as the Executrix of the Estate of Robert Godwin Sr., deceased having fully stated her claims against Defendants, demands judgment against Defendants on behalf of the next of kin of the decedent, in an amount in excess of $25,000.00 for all of the following:

    a.  compensatory damages;

    b.  punitive damages;

    c.  the costs, expenses, and attorney's fees incurred by Plaintiff in this action; and

    d.  any further relief that this Court may deem appropriate.

22

Respectfully submitted,


/s/ Andrew A. Kabat
Andrew A. Kabat (0063720)
Shannon J. Polk (0072891)
Richard C. Haber (0046788)
Daniel M. Connell (0078418)
Mark Humenik (0065636)
Haber Polk Kabat, LLP
1300 E. 78th Street, Suite 305
Cleveland, OH 44102
(216) 241-0700
Fax: (216) 241-0739
akabat@haberpolk.com
spolk@haberpolk.com
rhaber@haberpolk.com
dconnell@haberpolk.com
mhumenik@haberpolk.com




/s/ Eric Kennedy
R. Eric Kennedy (0006174)
Daniel P. Goetz (0065549)
Weisman, Kennedy & Berris Co., L.P.A.
101 W. Prospect Avenue
Midland Building, Suite 1600
Cleveland, OH 44115
(216) 781-1111
Fax: (216) 781-6747
ekennedy@weismanlaw.com
dgoetz@weismanlaw.com



*Attorneys for Plaintiff*

23

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims able to be tried to a jury.

_/s/ Andrew A. Kabat_____
Andrew A. Kabat (0063720)

24